# United States Court of Appeals
## For the First Circuit

No. 25-1734

AMRO FARID,

Plaintiff, Appellant,

v.

TRUSTEES OF DARTMOUTH COLLEGE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Aframe, Lipez, and Dunlap,
Circuit Judges.

Joseph L. Sulman, with whom Law Office of Joseph L. Sulman, Esq., was on brief, for appellant.

Pierre A. Chabot, with whom Stephen Zaharias and Devine, Millimet & Branch, P.A., were on brief, for appellee.

July 13, 2026

**DUNLAP**, <u>Circuit Judge</u>. Appellant-Plaintiff Amro Farid, a professor employed for six years by the Thayer School of Engineering at Dartmouth College ("Dartmouth"), brought suit under Title VII, 42 U.S.C. § 2000e, and New Hampshire's employment discrimination statute, N.H. Rev. Stat. § 354-A, alleging that Dartmouth (1) discriminated against him on the basis of his religion and national origin when it denied him tenure, and (2) retaliated against him for filing a complaint of discrimination by initiating research misconduct proceedings against him. The district court entered summary judgment for Dartmouth, reasoning that no reasonable jury could find in Farid's favor given Dartmouth's articulated reasons for its conduct. We affirm the judgment.

**I.**

We recount the evidence submitted on summary judgment, "construing the record in the light most favorable to the non-movant and resolving all reasonable inferences in that party's favor." <u>Prescott</u> v. <u>Higgins</u>, 538 F.3d 32, 39 (1st Cir. 2008).

**A. Tenure Proceedings**

In 2015, Farid -- who is Muslim and Arab-Egyptian -- joined the Thayer School of Engineering at Dartmouth College as an Associate Professor. Farid expected that, as an Associate Professor, he would become eligible for tenure

after just three years of teaching.  Nonetheless, he agreed in his offer letter to become eligible for tenure after six years.

Shortly after Farid joined the Dartmouth faculty, a Muslim student group invited him to serve as a professor-advisor, but then-Dean Joseph Helble discouraged him from doing so until he attained tenure.  According to Farid, a non-Muslim professor, Doug Van Citters, was encouraged to help with the Dartmouth rowing team even though he had not yet attained tenure.

In September 2019, Farid began advising a group of students on a project studying the campus energy system.  Just one month later, he received an email from another professor involved with the project, Solomon Diamond, informing him that Dean Helble "did not think [] highly of . . . the students' work" and asking him to "step away from the team."  Farid viewed his removal as "impeding [him] from developing [his] research" because he "was not allowed to gain access to Dartmouth energy system data or work on . . . the campus energy system in any way."

In 2018, Dean Helble advised Farid that he would need to use "the full six years of [his] tenure clock" to improve his negative "teaching evaluation scores" in multiple classes.  Farid also received two one-year postponements for tenure review, such that he could have deferred his application until the 2022-23 academic year.  During the summer of 2020, however, he met with Dean Alexis Abramson (who had since replaced Dean Helble) and

- 3 -

Associate Dean Laura Ray to "get a clear indication" of "when it [wa]s appropriate to go up for tenure" and "whether [he] still remain[ed] in danger of termination through a failed tenure review." Dean Abramson and Associate Dean Ray encouraged him to apply for tenure that year, but they did not sufficiently warn him that he could be placed on a terminal appointment if he was denied tenure. Farid then submitted his application for tenure in the 2020-21 academic year, unaware that an unsuccessful submission could foreclose his ability to reapply for tenure later.

At the time of his tenure application, Farid had published a total of forty-five refereed journal articles; these included twenty-two refereed journal articles since joining Dartmouth in 2015. Notably, his publications cited his own work at an unusually high rate. Farid also received approximately $1.9 million in research funding; of this, $1.2 million was not competitively awarded through any merit-based selection process. Farid did not disclose that the largest grant listed on his CV, from the National Science Foundation ("NSF"), had an "EDGAR" designation, which signified that it was not a "peer reviewed" award. Further, Farid taught three courses from 2016 to 2021,[1] for which he received below-average course evaluations and

[1] Farid taught "ENGS 22: Systems" from 2016 to 2020, "ENGS 175: Energy Systems" from 2016 to 2020, and "ENGS 199: Model-Based System Engineering" from 2018 to 2021.

- 4 -

negative comments from numerous students. His teaching scores slightly improved over his initial years at Dartmouth, but they declined "precipitously" beginning with the Fall 2020 term, when he began teaching online for the first time due to the COVID-19 pandemic. Four external reviewers identified by Farid, each of whom had previously collaborated with him on academic projects, submitted letters on his behalf, along with six additional reviewers identified by the committee. Of these, eight reviewers recommended that he receive tenure, one recommended against tenure, and one did not specify.

Dartmouth's faculty handbook sets forth "expectations of performance" for a candidate applying for tenure, including that the applicant demonstrate "an outstanding record both as a scholar and a teacher." Review of a candidate's scholarship includes, among other criteria, the "qualit[y]" of work and "contributions to the larger scholarly . . . communities" -- which are viewed as "more consequential than the quantity of work" -- and places "significant weight" on both the views of "Dartmouth colleagues" and "the judgment of professionals outside [Dartmouth]." Review of a candidate's teaching requires "[c]omparative judgment by current and former students and by faculty colleagues" and consideration of the applicant's "classroom instruction," "[w]ork with individual . . . students," and "course and program development."

The tenured faculty at the Thayer School of Engineering met regarding Farid's application on April 7, 2021. They discussed his qualifications related to his teaching and scholarship, including student evaluations of his courses, external review letters from professors, the quality and impact of his scholarship, and the amount and types of grants he received. The faculty noted, among other things, that Farid's application "seem[ed] to be excessively over inflated with respect to his accomplishments and impacts"; that his scholarship "appear[ed] to have an unusually high number of self-citations"; that he did not "g[e]t a lot of grants" or "have an established flow of US funding"; that his CV failed to note that the listed NSF grants "[we]re actually one E[DGAR] grant" and "not peer reviewed awards"; that his recent student course evaluations "were . . . abysmal"; and that the reviewers identified by Farid were all former collaborators of his. Comprehensive minutes of the meeting contain no mention of Farid's religion or national origin.

The faculty voted by secret ballot, with eighteen members voting against granting Farid tenure, three members voting for tenure, and three members abstaining. Dean Abramson thereafter submitted a letter to the Committee Advisory to the President (the "CAP") that recommended "reinitiat[ing] the tenure review process during the 2022-23 academic year." The CAP

- 6 -

declined to do so, denying Farid tenure and offering him a terminal appointment for the 2021-22 school year.

The year before, Dartmouth had awarded tenure to Vikrant Vaze, an Assistant Professor in transportation engineering who "is of Indian national origin and non-Muslim." Professor Vaze "routinely" received student course evaluations "in the very good to excellent range," which "ma[d]e him among the most highly regarded teachers at Thayer." He had published sixteen journal articles, three book chapters, and three conference publications at Dartmouth before applying for tenure. Professor Vaze also had eight active extramural grants from a diverse stream of sources, including a $1 million Department of Defense ("DOD") award and the highly competitive NSF CAREER award, which totaled over $1.7 million. Finally, his identified reviewers -- including those who had previously collaborated with him and those who had not -- provided universally positive feedback.

Farid appealed his tenure denial to an internal Dartmouth review committee on May 17, 2021, challenging certain "procedural" issues. In October, the review committee issued a report finding that "procedural errors occurred that could reasonably have affected Prof[essor] Farid's tenure case," including that Associate Dean Ray "did not appropriately explain the ramifications" of applying for tenure -- specifically, that a denial would result in a terminal appointment. The committee also

noted that although Farid "was appointed as an associate professor without tenure," the record "indicate[d] that [he] was treated as an assistant professor." The committee thus reversed the CAP's tenure decision so that Farid could reapply for tenure the following year, and it instructed Dartmouth to amend its faculty handbook to (1) clarify in the "Guide to Candidate" section that "a candidate gets only 'one bite at the apple' of tenure," and (2) feature "procedures for individuals hired as associate professors without tenure . . . more prominently." The committee disclaimed, however, any conclusion as to "whether Prof[essor] Farid should have been promoted to Associate (or Full) Professor with tenure" at that time.

On September 1, 2021, Farid separately appealed his tenure denial to Dartmouth's Office of Institutional Diversity & Equity ("IDE") on grounds that it violated Dartmouth's anti-discrimination policies. The IDE engaged an outside investigator and denied his appeal on December 2, 2021, based on the investigator's findings that no evidence showed discrimination due to his Muslim religion or his Arab-American national origin.

**B. Research Misconduct Proceedings**

In the fall of 2019, Farid began working with one of his graduate students, Prabhat Hegde, on a research paper titled "A Profit-Maximizing Security-Constrained IV-AC Optimal Power Flow Model & Global Solution" (the "IV-ACOPF Paper"). Hegde

contributed to the IV-ACOPF Paper from early November 2020 through February 2021; his work on the IV-ACOPF Paper included research, drafting, and related correspondence with Farid. Hegde and Farid drafted the IV-ACOPF Paper through an editing program called Overleaf, which allowed authors to collaborate in real time and track historical changes. In January 2021, Farid criticized Hegde's work and told him that he would have to "relegate [Hegde] out of the first author position" on the IV-ACOPF Paper if his work did not improve. Hegde ultimately left Farid's laboratory in March 2021 but retained ownership of the Overleaf repository for the IV-ACOPF Paper.

On December 27, 2021, Farid published the IV-ACOPF Paper in Dartmouth's IEEE Access Journal (the "Journal") and listed himself as the sole author. On January 7, 2022, Hegde reported to Associate Dean Holly Wilkinson his concerns about being excluded as an author on the IV-ACOPF Paper and inquired regarding the "processes available to him to resolve" the issue. After consulting with Dean Abramson, Associate Dean Wilkinson referred Hegde to Dartmouth's Research Misconduct Policy ("RMP"), which governs the resolution of complaints of research misconduct, and directed Hegde to submit his allegations to Dean Abramson. Dean Abramson did not refer Associate Dean Wilkinson to the Journal's own Authorship Guidelines, which set forth "an internal process

. . . independent of" Dartmouth for addressing authorship disputes.

On January 18, 2022, Hegde submitted his allegations to Dean Abramson in an email titled "Research [M]isconduct [C]omplaint," which described what Hegde "believe[d] [wa]s an obvious case of research misconduct" due to Farid's failure to acknowledge his contribution to the IV-ACOPF Paper. The email requested that Hegde "be included in the authorship" of the IV-ACOPF Paper, citing the requirements for authorship set forth in the Journal's Authorship Guidelines.

Provost David Kotz delegated oversight of the investigation of Hegde's complaint to Vice Provost of Research Dean Madden. At the time, although Vice Provost Madden "knew there was a conflict around . . . some aspect of [Farid's] appointment," he did not know specifics, and he "stay[ed] out of discussions relating to any other processes that . . . might not be relevant to the research and misconduct process." In accordance with Dartmouth's standard procedure, Vice Provost Madden first "interrogate[d] the individual policies" to determine whether the RMP, Authorship Guidelines, or both applied to Hegde's complaint. Suspecting that both policies applied, Vice Provost Madden first encouraged Hegde to "reach out and attempt to resolve" the authorship dispute "through direct discussions" with Farid

under the Authorship Guidelines.[2]  In parallel, he considered whether Hegde's complaint "f[e]ll within the rubric of research misconduct," and concluded that "an inquiry [wa]s warranted" under the RMP -- a conclusion with which Dean Abramson concurred -- because the allegations fell within the definition of "plagiarism" and were "sufficiently credible and specific so that potential evidence of [r]esearch [m]isconduct may be identified."[3]

Dartmouth's Director of Research Integrity, Henrike Frowein, reported to Vice Provost Madden and facilitated the research misconduct investigation from start to finish.  In May 2022, Director Frowein led the formation of an inquiry panel, consisting of three faculty members who were not involved in Farid's tenure case, to determine whether a research misconduct investigation was warranted.  In July 2022, the inquiry panel determined that an investigation was warranted because the allegations satisfied the "plagiarism" component of "research

---

[2] The Authorship Guidelines provide that "[a]uthors should attempt to resolve authorship disputes themselves.  If disputes cannot be settled, they should be referred to a third party (department chair, Dean, or Provost) for resolution."

[3] The RMP defines "research misconduct" as the intentional, knowing, or reckless "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results," with "plagiarism" meaning "the appropriation of another person's ideas, processes, results or words without giving them appropriate credit."

misconduct" and "there [wa]s sufficient evidence" to "indicate[]" that the allegations "may have substance."

In May 2023, Vice Provost Madden accepted the panel's recommendation and assembled an investigation committee, consisting of Andrew Campbell and Prasad Jayanthi -- two professors in Dartmouth's Computer Science Department -- and Kenneth Loparo -- a professor in Energy Systems Engineering from Case Western Reserve University. None of these professors were involved in Farid's tenure case. At a committee meeting that month, Vice Provost Madden advised against "open[ing] the frame" of the investigation to issues that "fall into a different bucket" than "research misconduct" and "d[o] [not] impact the case," such as, for example, "unprofessional behavior, bad mentoring, [or] wasting money."

The RMP requires that Dartmouth "sequester" all relevant research records during the inquiry and investigation. It also provides that during the initial inquiry, "[s]upervised access to the data and/or documents should be available" to the parties, and that, when a draft report issues after an investigation, the respondent should receive "a copy of, or supervised access to, the evidence on which the report is based." Although Farid requested through counsel "immediate access to all data submitted" by Hegde in support of his allegations, Dartmouth initially sequestered the relevant records as evidence, including the Overleaf repository.

- 12 -

In August 2023, Farid's counsel sent a letter to Hegde's home, demanding the Overleaf repository and threatening litigation. Director Frowein suggested that the committee "consider whether this contact should be treated as retaliation or intimidation, which the [RMP] expressly prohibits." Dartmouth nonetheless provided Farid access to the Overleaf repository in September 2023, a year before the committee issued its draft report.

Director Frowein invited Farid several times to interview with the committee. Farid declined, claiming his "medical condition" barred him from participating, and instead requested that the interview "be conducted via written questions." The committee declined because a written exchange would deprive it of the ability to interact with Farid in real time, pose timely follow-up questions, and assess his credibility. In October 2023, Farid emailed Director Frowein a 311-page report (the "Overleaf Report"), which he described as a "definitive analysis of the provenance of the [IV-ACOPF Paper] through a comprehensive comparison of the various manuscripts in the Overleaf repository that Prabhat Hegde controlled between December 8, 2020 and February 16, 2021, [Farid's] research notes that predate the repository, and the final manuscript submitted for publication." The committee reviewed the Overleaf Report but could not make sense of it due to Farid's "failure to provide clear written explanations for the hundreds of pages of documents he provided." Although

- 13 -

Farid noted in his email that he was "happy to answer any questions about [his] analysis," the committee perceived this offer as "hollow" due to his "refusal to appear for an interview" or provide "clear . . . explanations" of its content. The committee suggested that Dartmouth hire a consultant to review the Overleaf Report, which Director Frowein approved; ultimately, however, the committee opted not to hire a consultant because it "felt the right thing was for the committee to" make its best effort to "understand and process all of the information" itself "and make a . . . well-understood judgment based on that," rather than deferring to the opinion of "external experts."

In January 2024, as "part of [her] responsibilities" in facilitating the investigation, and without any instruction from the committee, Director Frowein prepared a shell of the investigation report so that "the prep work [was] done once the committee [wa]s ready to move to a decision." Director Frowein included under the "Conclusion" header that "[t]he Committee concludes that Research Misconduct did occur."

In January 2024, Director Frowein informed the committee of Farid's filing of the instant lawsuit related to his tenure denial. In March, the committee raised concerns about Farid's "conflat[ion]" of "the misconduct case with the tenure case" and the "surprising comments" made about the committee in his lawsuit. Because the committee no longer "s[aw] a way forward in working

- 14 -

within the normal research misconduct process," each of its members resigned.

Professor Loparo ultimately agreed to return to the committee, along with Mark Barnes, the former Senior Research Officer and Senior Associate Provost for Research at Harvard University and a faculty member at Yale Law School. Barnes was also a partner at Ropes & Gray LLP, where he served as outside counsel to Dartmouth for the research misconduct investigation until stepping away from that role to join the committee.

On October 18, 2024, the new two-member committee provided Farid and Hegde for comment a draft report. The draft report concluded that no research misconduct occurred. It further stated that the committee found by a preponderance of the evidence that Hegde's contribution "merit[ed] authorship credit," noted that Farid's conduct "constitute[d] grossly unprofessional conduct," and concluded that Farid's behavior toward Hegde was "reprehensible and his submission of a collaborative work without proper authorship attribution a breach of professional ethics." Upon reviewing Farid's comments to the draft report, Director Frowein wrote to the committee: "Many of the exhibits [attached to his response] have very little or nothing to do with the research misconduct matter[, and I'm] seeing many of them for the first time . . . . Together with the exhibits I interpret this as another attempt to pull the research misconduct matter prominently

into the litigation against Dartmouth, and portra[y] it as a retaliatory move." The next day, after receiving Hegde's comments, Director Frowein wrote that she "continue[d] to be very troubled by the retaliatory nature of [Professor] Farid's actions against [Hegde]" and "wonder[ed] if the language addressing" his removal as an author on other papers "should be strengthened," noting that "[o]f course th[at] [wa]s the committee's decision."

After considering the comments submitted by both Farid and Hegde, the committee issued a final report on December 12, 2024 (the "Final Report"). Professor Loparo believed that Hegde "at least [] should have been acknowledged in the [IV-ACOPF] Paper" but deferred to the authorship-dispute process to resolve questions regarding authorship credit. Still, both members of the committee voted to include a conclusion in the Final Report that Hegde "deserve[d] authorship credit, or an acknowledgment at the least, for his months of hard work and overall contribution" to the IV-ACOPF Paper; the Final Report also stated that although Farid's denial of authorship credit or acknowledgement to Hegde was "reprehensible" and a "breach of professional ethics," a preponderance of the evidence did not show that he plagiarized Hegde's work. The Final Report recommended that "the Provost, as Deciding Official, review and act on [the committee's] assessment of authorship credit, or acknowledgement."

- 16 -

The Final Report also recommended that "Dartmouth not consider Prof[essor] Farid for any Dartmouth faculty appointment" and that he "not be allowed to serve as a sub-awardee or collaborator for any Dartmouth faculty, nor as an advisor, collaborator, or dissertation committee member for any Dartmouth student." Professor Loparo did not believe that this discipline fell within the purview of the research misconduct proceedings, but he voted with Barnes to allow it "to go in the [F]inal [R]eport" because the Provost would ultimately "decide what to do" with the committee's recommendation. The Final Report also referred to the Provost's Office "the allegation that Prof[essor] Farid retaliated against [] Hegde" for bringing his research-misconduct complaint "by removing [] Hegde from additional academic papers on which [he] contributed."

After the issuance of the Final Report, Provost Kotz sent a letter to Farid requesting that he "facilitate the addition of . . . Hegde as an author" to both (1) the IV-ACOPF Paper, and (2) another paper to which Hegde contributed, titled "The hetero-functional graph theory toolbox."

C. **Procedural History**

On November 30, 2021, Farid filed an administrative charge with the New Hampshire Commission for Human Rights, alleging that Dartmouth discriminated against him based on his religion and national origin. He amended the charge on November 9, 2022, to

add allegations that Dartmouth retaliated against him through the research misconduct proceedings. On December 14, 2021, the Commission forwarded the complaint to Dartmouth.

Farid later withdrew his charge from the Commission and, on September 11, 2023, sued Dartmouth in federal district court. He raised claims of discrimination based on religion and/or national origin in violation of Title VII (Count I) and New Hampshire Revised Statute Section 354-A:7 (Count II), as well as retaliation in violation of Title VII (Count III) and New Hampshire Revised Statute Section 354-A:19 (Count IV). The district court granted Dartmouth's motion for summary judgment on all claims.

Farid timely appealed. He challenges the district court's grant of summary judgment on his discrimination and retaliation claims. He separately challenges the district court's order compelling him to produce the metadata associated with his document production in this case.

## II.

### A.    Standard of Review

"We review the grant of summary judgment de novo, affirming only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law.'" Brandt v. Fitzpatrick, 957 F.3d 67, 74 (1st Cir. 2020) (emphasis omitted) (quoting Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)); Fed. R. Civ. P. 56(a). "That means we draw all reasonable inferences in [the non-movant's] favor; but we won't 'draw unreasonable inferences or credit bald assertions, empty conclusions,' or 'rank conjecture.'" Id. at 75 (emphasis omitted) (quoting Pina, 740 F.3d at 795). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Id. (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015)).

B. **Discrimination**

Title VII of the Civil Rights Act provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . religion . . . or national origin."[4] 42 U.S.C.

---

[4] New Hampshire law likewise provides that "[i]t shall be an unlawful discriminatory practice" for "an employer, because of the . . . religious creed[] or national origin of any individual, . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." N.H. Rev. Stat. § 354-A:7. We apply the same standard to Farid's discrimination claim under New Hampshire law because "the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A." Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011) (citing Madeja v. MPB Corp., 821 A.2d 1034, 1042 (N.H. 2003)).

§ 2000e-2(a)(1).  Farid argues that the record contains sufficient evidence to create a genuine issue of material fact as to whether Dartmouth discriminated against him based on his religion and national origin in denying him tenure.  We disagree.

In the absence of direct evidence of discrimination, we apply the three-step, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), to determine whether circumstantial evidence supports such a claim.  See Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 46 (1st Cir. 2013).  Under that framework, "[a] plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence."  Id.  That requires the plaintiff to show that (1) he "was a member of a protected class," (2) he "was qualified for the job," (3) he "suffered an adverse employment action," and (4) "the adverse employment action transpired under circumstances giving rise to an inference of discrimination."  Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs., 123 F.4th 565, 571 (1st Cir. 2024).  If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to rebut the presumption of discrimination by providing legitimate, non-discriminatory reasons for [its] action."  Aly, 711 F.3d at 46.  If the defendant meets this burden, "the plaintiff must then prove by a preponderance that the proffered reasons by the defendant are a pretext for unlawful discrimination," either by demonstrating that "the

adverse employment action was (1) 'more likely motivated' by discrimination than by the explanation proffered by the defendant; or (2) 'the proffered explanation [was] unworthy of credence' where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation." Id. (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)).

The parties do not dispute that Farid established a prima facie case of discrimination, or that Dartmouth articulated a legitimate, non-discriminatory reason for denying him tenure. Their dispute arises at the third step: whether Farid has shown, by a preponderance of the evidence, that Dartmouth's proffered reason was pretext for unlawful discrimination. Farid relies on three general categories of evidence that he argues show pretext: (1) disparate treatment, (2) Dartmouth's purported violations of its tenure policy, and (3) an unfriendly work environment.

Examining each category of evidence in turn,[5] we conclude that Farid has failed to put forward evidence of retaliation -- a

_____

[5] For completeness, we note that Farid contends that the district court improperly applied a formulaic checklist approach to his discrimination claims, parsing his evidence as discrete events rather than viewing his evidence in light of the record as a whole. It did not. As we do here, the district court simply addressed Farid's evidence in terms of understandable categories. For the reasons described below, viewing the record as a whole and in the light most favorable to Farid, there is no genuine dispute of material fact as to whether Dartmouth discriminated against him on the basis of his religion or national origin. See Fed. R. Civ. P. 56(a).

- 21 -

failure that is fatal to his claim. We do not "sit as [a] 'super-tenure' committee[]," Villanueva v. Wellesley College, 930 F.2d 124, 129 (1st Cir. 1991), and have rightly been "wary of intruding into the world of university tenure decisions," which "necessarily hinge on subjective judgments." Brown v. Trs. of Bos. Univ., 891 F.2d 337, 346 (1st Cir. 1989) (quoting Kumar v. Bd. of Trs., Univ. of Mass., 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring)). Because Farid has not provided evidence of pretext "of such strength and quality as to permit a reasonable finding that the denial of tenure was 'obviously' or 'manifestly' unsupported," we will "not simply substitute [our] own views concerning the plaintiff's qualifications for those of the properly instituted authorities." Id.; see Bina v. Providence Coll., 39 F.3d 21, 26 (1st Cir. 1994).

### 1. Disparate Treatment

Farid first argues that Dartmouth's award of tenure to another professor, Vikrant Vaze, the year before it denied him tenure reveals pretext through disparate treatment. To establish disparate treatment, "a plaintiff must show 'that others similarly situated to [him] in all relevant respects were treated differently by the employer.'" Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003)). "'Reasonableness is the touchstone' when considering comparators in a disparate treatment case; that

- 22 -

is, 'while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.'" Ray, 799 F.3d at 114 (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). "No valid comparison can be drawn between two incidents for the purpose of proving disparate treatment if 'differentiating or mitigating circumstances' distinguish" the material facts. Conward, 171 F.3d at 21 (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)).

The record evidence does not permit a reasonable jury to conclude that Professor Vaze was "similarly situated to [Farid] in all relevant respects." See Garcia, 535 F.3d at 31. Although Professor Vaze worked for the same department, and he applied for tenure in successive years to the same tenure committee and through the same tenure process as Farid did, he differed from Farid in a key respect: his qualifications. Dartmouth's faculty handbook expressly requires that a candidate applying for tenure demonstrate "an outstanding record both as a scholar and a teacher." Professor Vaze outperformed Farid in each category. As for his scholarship, the record shows that Professor Vaze received more funding for his research and better feedback in his external review letters; that he received more competitive grants and did not misrepresent the type of grants he received; and that he did

not frequently cite to his own scholarship like Farid did.[6]  As for his teaching, the record shows that Professor Vaze received consistently higher evaluation scores and better reviews from students.

Farid suggests that whether Professor Vaze had a superior record is irrelevant to the question of whether he is admissible as a comparator.  The question at hand, however, is not whether Farid's comparator evidence is admissible, but whether it could support a jury finding that Dartmouth treated him disparately.  And here, the "differentiating" facts preclude any "valid comparison" between Professor Vaze and Farid "for the purpose of proving disparate treatment."  See Conward, 171 F.3d at 21; see also Theidon v. Harvard Univ., 948 F.3d 477, 501 (1st Cir. 2020) (affirming summary judgment of employment discrimination claim where plaintiff could not "connect the dots

---

[6] Farid does not dispute these facts but asserts that the record reflects that he "had comparable funding . . . to Vaze and a superior scholarship record in terms of publications."  But as already explained, he received less competitive funding than Professor Vaze did; indeed, he failed to disclose the "EDGAR" designation of the largest grant listed on his CV.  And although Farid's publications outnumbered Professor Vaze's, the committee expressed concern with the high rate of self-citation in those publications.  Moreover, the committee that reviewed Professor Vaze's application justified fewer publications in his case because "the publication cycle of many of the journals that Dr. Vaze publishes in follow the economics and management science norms and are measured in years instead of months and tend to be significantly longer than a typical engineering or medical article."

between her candidacy for tenure and that of her male comparators" because the record did not support that her proffered comparators "were in fact similarly situated to her").

Nor, contrary to Farid's arguments, did Dartmouth apply different standards in evaluating the external reviewers submitted by Professor Vaze. According to Farid, both professors identified external reviewers to the tenure committee from former collaborators, but the faculty only raised concern about bias with respect to Farid's reviewers. As the faculty noted, however, Farid's four "letters from recommended reviewers [we]re entirely from his [former] collaborators," whereas Professor Vaze identified former collaborators as just four of eight of his chosen reviewers. The faculty noted an additional difference in Farid's review letters in that they lacked "detail[] about [his] specific contributions to the field." These are material differences in the quality of the external reviews contributed by the candidates.

Farid also insists, without citation, that Dartmouth has acknowledged that student evaluations are inherently biased. To the extent this accusation refers to an email from a faculty member with an attachment titled "Student evaluations of teaching are deeply flawed," nothing in the record indicates that the email's author spoke on behalf of Dartmouth or had analyzed teaching evaluations at the Thayer School of Engineering, including any for Farid or Professor Vaze. We therefore need not credit Farid's

speculation that the committee treated him unfairly by comparing his teaching evaluations to Professor Vaze's. See Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008) ("[T]he . . . [c]ourt is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the [c]ourt by a party.").

Farid finally asserts that the district court did not expressly rule that Professor Vaze is, or is not, a comparator. To the contrary, the district court concluded that Professor Vaze's "superior status in terms of funding, student reviews, and evaluations all undermine Farid's argument that Vaze is an appropriate comparator" and that Farid had thus "not shown pretext based on Vaze's success and his own lack of success in the tenure process." The record supports the district court's conclusion.

### 2. Policy Violations

Farid next points to other circumstantial evidence that he claims shows discriminatory intent, including that Dartmouth purportedly violated or inconsistently applied several of its policies to his detriment. "'Evidence that [an] employer deviated from its standard procedure or policies in taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry,'. . . if the deviations are otherwise 'inexplicable and troubling.'" Ing v. Tufts Univ., 81 F.4th 77,

83 (1st Cir. 2023) (first quoting Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50 (1st Cir. 2019); and then quoting Theidon, 948 F.3d at 499). Such deviations are "inexplicable and troubling" when they target an employee with adverse action without any legitimate explanation. See, e.g., id. (quoting Theidon, 948 F.3d at 499); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 33–34 (1st Cir. 2012) (concluding that a factual issue existed as to pretext, barring summary judgment, in retaliation case where evidence showed employer strayed from "its own drug testing protocol" by "singl[ing] out" an employee for drug testing with no explanation "as to when or how the [employee] was chosen" and discharged employee when he refused to submit to more testing); Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998) (concluding there was "thin" but sufficient evidence to create jury issues on pretext where employer failed to follow layoff policy giving deference to seniority and, instead, "simply fill[ed] in names of persons to be laid off" based on a list compiled a year prior with a different set of criteria, which led to the termination of a senior employee). A reasonable jury could not find Dartmouth's actions to be "inexplicable" or "troubling." See Ing, 81 F.4th at 83 (quoting Theidon, 948 F.3d at 499).

Farid asserts that Dartmouth violated its tenure policies by failing to advise him that a negative vote on tenure could result in a terminal year appointment. He cites the finding

on appeal by Dartmouth's internal review committee that Associate Dean Ray "did not appropriately explain the ramifications" of applying for tenure before his tenure clock expired. This issue, however, is a red herring. Dartmouth did not depart from its policies at all in not explaining the ramifications of the tenure vote to Farid (and thus did not disadvantage him individually); rather, the failure in communication applied to all tenure applicants. Further, Dartmouth rectified this generally applicable "procedural error" by revoking its placement of Farid on a terminal year appointment, thus allowing him to try again for tenure the next year. In other words, the record shows a misunderstanding by Dartmouth administrators on how to apply a policy generally. Nothing suggests that this was anything but an interpretive error that was corrected by Dartmouth. That is not evidence of pretext.

We are also not persuaded that Dartmouth violated its tenure policy by treating him as an assistant professor, requiring him to wait six years to apply for tenure even though he was hired as an associate professor. As an initial matter, Farid expressly agreed to the six-year tenure timeline in his offer letter, even after negotiating for the "associate professor" title. He nonetheless speculates that, if he had been treated as associate professor -- the title he received at appointment -- he could have applied for tenure after three years, when he had a better trend

- 28 -

in his student evaluations.  But the faculty who ultimately considered Farid's application recognized that the worsening of his teaching scores in 2020 "may [have] be[en] attributed to COVID-related challenges," not his personal performance, and even suggested that he be given another year to improve his "abysmal" teaching evaluations "without the C[OVID] situation."  In any event, although his evaluations showed a trend of improvement from 2016 to 2020, he still received worse scores than other professors who taught the same courses.  Indeed, at the time of Farid's reappointment in 2018, then-Dean Helble advised him that he would need "the full six years" before applying for tenure specifically because of his poor "teaching evaluation scores."  On this record, a reasonable jury could not reach the conclusion that Farid would have been better situated to obtain tenure had he applied after three years instead of six.

Accordingly, to the extent that Dartmouth deviated from its tenure policies, the record does not support that it did so in an "inexplicable and troubling" way, because neither its insufficient explanation of the consequences of tenure denial nor its contracting with Farid for a six-year tenure timeline adversely impacted his chances for tenure.  See Ing, 81 F.4th at 83 (quoting Theidon, 948 F.3d at 499).

### 3. Unfriendly Work Environment

As to his third category of evidence regarding Dartmouth's discriminatory intent, Farid relies upon purported evidence of an "unfriendly work environment." He claims that Dartmouth discouraged him from participating as a faculty advisor for a Muslim student group, while allowing non-Muslim faculty to participate in extra-curricular activities during tenure-track years; prevented him from obtaining campus-wide energy systems data for his research; and removed him as an advisor to a student project relating to that data. Importantly, however, Farid fails to connect these actions to discrimination based on his religion or national origin. See Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19, 22 (1st Cir. 1999). To the contrary, his testimony confirms that his own poor performance motivated Dartmouth's actions: namely, Dean Helble advised Farid against joining the Muslim student group so that he could focus on improving his tenure case; and Dean Helble directed that Farid be removed from the student project and precluded from accessing Dartmouth energy system data due to Helble's dissatisfaction with the work of the students whom Farid was advising. Farid identifies no evidence rebutting these explanations; absent such evidence, the record does not support that Dartmouth's "proffered reason"

for denying him tenure "was actually a pretext for unlawful discrimination." Id. at 22.[7]

## C.    Retaliation

Title VII also provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[8]  42 U.S.C. § 2000e-3(a).  Farid argues that the record contains sufficient evidence to create a genuine issue of material fact as to whether Dartmouth retaliated against him for bringing his discrimination claims.  Again, we disagree.

---

[7] We also note that Professor Farid provides no link between Dean Helble and the tenure proceeding; there is no evidence in the record that Dean Helble was involved in, or influenced, the faculty's deliberations or vote.  Nor is there any apparent connection between those involved with his requests for energy data and his tenure case.

[8] New Hampshire law likewise provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to . . . retaliate or discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under this chapter."    N.H. Rev. Stat. § 354-A:19.    Because "[t]he New Hampshire Supreme Court looks to and finds 'instructive' federal standards established under Title VII, 42 U.S.C. § 2000e et seq., in resolving retaliation claims under N.H. Rev. Stat. Ann. § 354-A," we apply those standards to Farid's retaliation claim under New Hampshire law. Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st Cir. 2008).

We apply a burden-shifting framework for retaliation claims similar to the one for discrimination claims. "First, the plaintiff must establish a prima facie case by demonstrating that (1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115 (1st Cir. 2024). If the plaintiff meets that burden, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." Id. (quoting Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015)). If the defendant does so, "the plaintiff [must] show that the defendant's explanation is a pretext," id. (alteration in original) (quoting Planadeball, 793 F.3d at 175), and "that retaliatory animus was the real motivating factor," Gerald v. Univ. of P.R., 707 F.3d 7, 24 (1st Cir. 2013).

The parties again dispute only the third step: whether Farid has proffered sufficient evidence of pretext for retaliation and that retaliatory animus was the real motivating factor. Farid contends that the circumstances as a whole, including Dartmouth's purported violations of policy, evidence of antagonism, and other evidence, show pretext and demonstrate that Dartmouth had a retaliatory animus when taking adverse action by investigating Hegde's complaint. Farid's retaliation argument fails at a fundamental level because "a reason cannot be proved to be a

pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason." Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 459 (1st Cir. 2016) (citation modified). We see no basis in the record to conclude that the protected activity in this case -- namely, filing of a discrimination claim -- "was a but-for cause of the alleged adverse action by the employer." Ing, 81 F.4th at 84 n.5 (quoting Theidon, 948 F.3d at 506). There is no evidence permitting the conclusion that Dartmouth's investigation of Hegde's complaint -- which was submitted independently by a student -- was carried out to retaliate against him. The evidence instead requires the conclusion that the investigation was carried out on a separate track, by individuals who were not involved in the tenure dispute. In any event, Farid's arguments as to pretext mischaracterize the record.

Farid first accuses Dartmouth of withholding essential evidence for the misconduct investigation -- the Overleaf repository -- from him until his attorney sent a demand letter to Hegde. But the record shows that Dartmouth acted in accordance with the RMP by initially sequestering the Overleaf repository during the inquiry and investigation phases. Although Dartmouth did not provide Farid access to the Overleaf repository until the investigation phase, Farid has not shown that his inability to access the data during the inquiry was rooted in antagonism towards

him. And Dartmouth ultimately did provide him access over a year before the committee issued its draft report and triggered an obligation to provide "a copy of, or supervised access to, the evidence on which the report is based." Farid then submitted extensive analysis of the Overleaf repository. These facts do not permit a reasonable finding of pretext.

Farid also insists that Director Frowein's comments about the investigation to the committee demonstrated antagonism. Those comments included, for example, statements that the committee "may want to consider whether" the demand letter sent by Farid's attorney to Hegde at his home "should be treated as retaliation or intimidation, which the [RMP] expressly prohibits"; that Farid was "making demands and allegations that are neither true nor acceptable" in connection to his refusal to be interviewed by the committee; that the Overleaf repository report prepared by Farid was "irrelevant" and that the committee already "ha[d] enough evidence" to make a determination; that language in the investigation report addressing Farid's removal of Hegde from other papers "should be strengthened"; and that Director Frowein "strongly prefer[red] a clear statement" in the report that Hegde "deserve[d] authorship". Director Frowein also prepared a shell of the investigation report for the committee report so that "the prep work [was] done once the committee [wa]s ready to move to a decision," and the shell included a conclusion that "Research

Misconduct did occur." Farid fails, however, to connect these statements to animus against him based on his tenure-related complaints. Further, the record contains no evidence that Director Frowein acted beyond the scope of her role as Director of Research Integrity or that she unduly influenced the investigation committee to find against Farid regardless of the evidence. Indeed, Director Frowein acknowledged that the committee would make the final decision, and the committee ultimately did that: it found no research misconduct and rejected her suggestion to make more forceful findings about whether Hegde deserved authorship credit or only an acknowledgement.

The record likewise does not support Farid's claim that the committee expanded its investigation to cover issues unrelated to research misconduct. It is true that Vice Provost Madden initially cautioned the committee against investigating issues that "d[id not] impact" whether Farid committed research misconduct -- such as "unprofessional behavior, bad mentoring, [and] wasting money." But Vice Provost Madden clarified that once an investigation has begun, it is "not [her] decision," but the committee's decision, as to whether "a piece of evidence is relevant." And here, as confirmed by committee member Barnes, the committee viewed the "totality of the interactions of the parties," including Farid's "course of behavior" towards Hegde after the alleged misconduct, to be relevant because it shed light on issues

like Farid's "credibility."  Farid presents no evidence suggesting that the committee had another motive in its review.

Farid also misconstrues the record by suggesting that it includes evidence that the investigation was biased against him.  For example, he claims that the investigation committee refused to consider his 311-page Overleaf Report that purportedly shows the changes made to the IV-ACOPF Paper after Hegde left his lab.  To the contrary, the committee did review the Overleaf Report; however, it could not make sense of it because Farid "fail[ed] to provide clear written explanations for [its] hundreds of pages."  Farid further hindered the investigation by declining repeated invitations to interview with the committee due to a purported "medical condition."  Given his lack of cooperation, the committee perceived his offer to "answer any questions" about his analysis as "hollow."  The committee further considered hiring a consultant to make sense of the Overleaf Report, but ultimately decided against outsourcing its fact-finding and decision-making roles to "external experts."  Under the RMP, Dartmouth defers to the committee's determination as to "whether experts . . . need to be consulted during the Investigation to provide special expertise regarding the analysis of evidence."  Especially given this deference, the committee's reasoned -- and undisputed -- explanations for its investigatory process, coupled

with Farid's uncooperative conduct, do not support a reasonable finding that Dartmouth's investigation was biased.

We also reject Farid's contention that a jury could find bias in the Final Report's dual recommendation that Dartmouth assess either authorship credit or acknowledgment to Hegde. It is true that one member of the two-member investigation committee, Professor Loparo, believed that -- although Hegde should receive an acknowledgement -- the authorship-dispute process should resolve questions of authorship. Professor Loparo also believed that the Final Report's measures precluding Farid's future collaboration with Dartmouth fell outside the purview of the research misconduct proceedings. Nevertheless, there is no dispute that Professor Loparo agreed to each recommendation in the Final Report, and there is no evidence that he was coerced or deceived into such agreement. To the contrary, he stated that Barnes, the other committee member, had no "more of a vote than" he did. The members of the committee simply reached a compromise recommendation. The record does not support a finding of bias where it shows the investigation committee followed standard procedure to reach its recommendations, which the Provost was then free to accept or reject.[9]

_____

[9] Farid argues that Dartmouth's order that Hegde receive authorship credit for another paper titled "The Hetero-functional Graph Theory Toolbox" also demonstrates bias. Professor Farid insists that this paper was never submitted for publication, but

Farid further argues that Dartmouth's choice to apply the RMP instead of the Authorship Guidelines demonstrated intent to retaliate. In support of this argument, he claims -- without record citations -- that "Dartmouth's own expert, Attorney Barnes, concluded that Hegde raised an authorship dispute and not an allegation of research misconduct." This conclusory statement aside, Farid identifies no evidence showing that the Authorship Guidelines, but not the RMP, applied to his case.

On our review, the record does not support Farid's argument. Hegde submitted his allegations to Dean Abramson under the title "Research [M]isconduct [C]omplaint" and described what he "believe[d] [wa]s an obvious case of research misconduct." Upon receiving this explicit complaint of research misconduct, the RMP required Dean Abramson to report it to the Provost, so she did. Then, in accordance with Dartmouth's standard procedure, Vice Provost Madden "interrogate[d] the individual policies" to determine whether the RMP, Authorship Guidelines, or both applied. The Authorship Guidelines and RMP are not mutually exclusive; they address separate but related issues and may apply together. Here, because Hegde's complaint alleged both (1) an authorship dispute, and (2) research misconduct in potential plagiarism, Vice Provost

he judicially admitted that it was by failing to timely answer Dartmouth's requests for admission. In any event, he presents no evidence showing that Hegde should not have received authorship credit.

- 38 -

Madden appropriately invoked each policy.  On one hand, he encouraged Hegde to "reach out and attempt to resolve" the authorship dispute "through direct discussions" with Farid under the Authorship Guidelines.  On the other, he assessed whether Hegde's complaint "f[e]ll within the rubric of research misconduct" under the RMP, ultimately determining that "an inquiry [wa]s warranted" into whether Farid plagiarized Hegde's work.  We see no error in this conclusion; the record does not support a finding that Dartmouth misapplied these policies to Hegde's complaint.

Finally, Farid claims that the district court failed to consider a large portion of evidence that he did not "specifically cite" in his argument but only in his factual summary.  Parties cannot expect a trial court to do their homework for them.  CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1526 (1st Cir. 1996) ("[C]ourts are . . . entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion."); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1991) ("[A] party has a duty 'to spell out its arguments squarely and distinctly . . . [rather than being] allowed to defeat the system by seeding the record with mysterious references . . . hoping to set the stage for an ambush should the ensuing ruling fail to suit.'") (quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990

(1st Cir. 1988)).  Even setting this aside, however, the record evidence -- when viewed as a whole -- supports the district court's conclusion that there is no dispute of material fact and that Dartmouth was entitled to judgment as a matter of law on retaliation.  <u>See</u> Fed. R. Civ. P. 56(a).  The district court carefully considered the record in reaching this conclusion. Accordingly, we agree that Farid's retaliation claims cannot survive summary judgment.

### III.

For the above reasons, we **<u>affirm</u>** the district court's grant of summary judgment on Farid's discrimination and retaliation claims under both federal and state law.  Because we affirm summary judgment, Farid's challenge to the district court's discovery order is moot.